IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NILDA RIVERA-CRUZ,

Plaintiff

v.                                                    CIVIL 04-2377 (ADC)

LATIMER, BIAGGI, RACHID
& GODREAU, LLP; FAUSTO DAVID
GODREAU ZAYAS, ESQ.

Defendants

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

      This matter is before the court on plaintiff Nilda Rivera-Cruz' motion *in limine* to exclude Steven Moshlak (hereinafter "Moshlak") from testifying as an expert witness.  (Docket No. 87, November 9, 2006.)  On December 4, 2006, the defendants, Latimer, Biaggi, Rachid & Godreau (hereinafter "LBRG") and Fausto David Godreau-Zayas (hereinafter "Godreau" and collectively "defendants") filed a motion in opposition to Moshlak's exclusion.  (Docket No. 95.)  Replies and sur-replies ensued (Docket Nos. 98 & 103) and, following a status conference on May 10, 2007, a Daubert hearing was scheduled for October 9 and 10, 2007.  (Docket No. 110.)  On May 30, 2007, I issued a report and recommendation to deny Rivera's motion to exclude Moshlak as an expert witness.  (Docket No. 111.)

      On June 1, 2007, Rivera filed a motion to clarify the setting of the Daubert hearing, noting that such a hearing was required for this court to carry out its

CIVIL 04-2377 (ADC)                    2

"gate-keeping" function.  (Docket No. 112.)  I agreed with Rivera, stressed that no objections to the report and recommendation were necessary, and the <u>Daubert</u> hearing remained on this court's calendar.  (Docket No. 115.)

On June 25, 2007, the court approved and adopted my report and recommendation (Docket No. 116), and on October 9 and 10, 2007, the <u>Daubert</u> hearing was held as scheduled.  (Docket Nos. 120 & 121.)

Having considered the arguments of the parties, the evidence presented at the <u>Daubert</u> hearing, and for the reasons set forth below, it is my recommendation that plaintiff Rivera's motion to exclude Moshlak as an expert witness be GRANTED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Rivera was a secretary for defendant Godreau at the law firm of LBRG from April 2002 to December 2003.  (Docket No. 29, at 2.)  Rivera alleges that during her tenure at LBRG, she was exposed to unwelcome pornographic images while using Godreau's computer to perform her secretarial duties.  (<u>Id.</u> at 3.)  Rivera alleges that when she complained about the pornographic images, she was demoted to an inferior position without explanation.  (<u>Id.</u> at 1.)  Rivera alleges that once she trained a secretary to replace her, Rivera was terminated from her position.  (<u>Id.</u>)

CIVIL 04-2377 (ADC)                    3

On December 16, 2003, Rivera filed a claim of sexual discrimination at the Puerto Rico State Department of Labor and on May 20, 2004, her claim was transferred to the Equal Employment Opportunity Commission ("EEOC"). (Id. at 5.)  The EEOC issued Rivera a right to sue letter and on December 15, 2004, Rivera filed her complaint with this court.  (Id.; Docket No. 2.)

Defendants claim the pornographic images are part of a widespread problem with LBRG's computers, alleging the images are a result of "pop-up" ads concerning various matters such as trips, sex, and gambling.  (Docket No. 32-1, at 3.)  Defendants allege Rivera was terminated due to chronic absenteeism and lateness.  (Id. at 4.)

After Rivera filed motions to compel discovery (Docket Nos. 24 & 27) and this court ordered defendants to produce (Docket No. 33), defendants provided plaintiff with the computer in question.  Rivera sent the computer, a laptop, to Global CompuSearch, LLC. (hereinafter "CompuSearch"), for forensic analysis. (Pl.'s Ex. 3; see also Docket No. 100.)   The computer was received by CompuSearch on October 11, 2005, a copy of its hard drive was made, and the laptop was returned to Rivera to return to Godreau.  (Pl.'s Ex. 3, at 1.)  On December 2, 2005, Marcus Lawson (hereinafter "Lawson"), president of CompuSearch, began an analysis of the copy of the hard drive.  (Id.)  Lawson issued a report on December 19, 2005.  (Id. at 5.)  Lawson provided "screen

CIVIL 04-2377 (ADC)                    4

captures," frozen stills of the screens he viewed while conducting his investigations, as exhibits attached to his report.  (Id., App.)

Lawson's preliminary examination revealed that the computer showed "regular, purposeful access to pornographic web sites and images." (Pl.'s Ex. 3, at 5, ¶ 2.)  Lawson began by explaining there are two different sections that may be searched in each computer hard drive:  the "active volume," where files visible to someone accessing the operating system are available, and the "unallocated file space," where files that have been previously deleted are stored.  (Id. at 1-2.)  As Lawson explained, deleted files are never really "deleted," but remain on the hard drive until overwritten by new information.  (Id. at 2, ¶ 1.)  Lawson used the program "Encase" to retrieve any previously deleted files.  (Id. at 2, ¶ 2.)  Lawson reported that, although he was unable to find any pornographic images in the active volume of the computer, he found "numerous images of adult pornography and erotica" in the unallocated file space.  (Id. at 2-3.)  Lawson did not attach any screen captures of pornographic images to this preliminary report.

Lawson also explained that files retrieved from the unallocated space lack context, and so he searched for clues to determine the circumstances surrounding any accessing of these files.  (Id. at 3, ¶ 1.)  Lawson noted that "many of the items found indicate a personal access to pornography sites using pieces of information peculiar to attorney Godreau. . . ."  (Id. at 3, ¶ 2.)  Specifically,

CIVIL 04-2377 (ADC)                         5

Lawson found the e-mail "latitude341@hotmail.com"[1] together with the name Fausto Godreau, an address in San Juan, Puerto Rico, and a birth date.  (Id. at 3, ¶ 3.)  Because the name Fausto Godreau had been typed in association with the e-mail latitutde341@hotmail.com, Lawson stated it was a reasonable assumption that this e-mail belonged to Godreau.  (Id.)

Lawson reported that the e-mail latitude341@hotmail.com was used in conjunction with the password "platerobank" in logging into the website "www.hotmovies.com" and "hardcoretriplexxxmag."  (Id. at 3, ¶¶ 3-4.)  Lawson reported the same phenomenon with the web site "teenxxxmag.com," with the password "platero."  (Id. at 4, ¶ 5.)  Lawson stated that not only are these adult web sites, but that the combination of an e-mail with a password suggests that there is a membership at these web sites.  (Id. at 3, 4.)

Lawson also noted there were pornographic images that were viewed, not from the internet, but from an external medium, such as a CD, thumb drive or remote hard drive.  (Id. at 3, ¶ 6.)  Lawson reported that these images "would not likely be the result of a virus." (Id. at 7, ¶ 1.)

Lawson observed that several areas of the unallocated file space showed what seemed to be visits to pornographic web sites.  (Id. at 4, ¶ 2.)  Lawson noted that because these were observations from the unallocated file space, it was

---

[1] www.hotmail.com is a website owned and regulated by Microsoft which provides users with access to free e-mail.

CIVIL 04-2377 (ADC)                              6

impossible to discern whether the web sites were purposefully visited or were the result of pop-ups or re-directions.  (Id.)  Lawson stated, however, that the sheer volume of pornography web sites visited tended to indicate that at least some of the visits were purposeful.  (Id.)  Lawson also noted instances where there was an entry for the web site www.hotmail.com, followed by a website such as "fuckingfreemovies."  (Id.)  Lawson stated it was a reasonable assumption that the user encountered an unsolicited pornographic e-mail in his account, but then clicked on a link to visit that site.  (Id.)  Lawson noted that merely accessing www.hotmail.com would not result in the web site being accessed.  (Id.)

Finally, Lawson's analysis showed that steps were taken to hide or delete data of the computer's use and history.  (Id. at 4, ¶ 9.)  "Numerous images of pornography" were deleted prior to Lawson receiving the computer.  (Id. at 4, ¶ 10.)

On February 2, 2006, the court granted plaintiff's proposed order to the Microsoft Corporation to produce "[a]ny and all information in possession of Microsoft Corporation related to the Hotmail user name latitude341@hotmail.com . . . ."  (Docket No. 52.)  Microsoft reported that this e-mail belonged to a "David Godro."  (Docket No. 57, at 7, ¶ vii.)  Even though the names are similar, they are not the same, and so Rivera still sought confirmation from Godreau that he used the e-mail latitude341@hotmail.com.  (Id.)

CIVIL 04-2377 (ADC)                    7

Defendants hired their own expert witness, Computerlegalexperts.com, to conduct a forensic analysis.  (Pl.'s Ex. 2; Pl.'s Ex. 1; see also Docket No. 87, at 5.) Steven Moshlak (hereinafter "Moshlak") issued a report on February 26, 2006. (Pl.'s Ex. 1, at 1.)  Moshlak reported he made a "mirror image" of Godreau's hard drive and "as is usual and customary, . . . elected to utilize and approach in [sic] the investigation from an inside-out perspective by performing a series of tests, which involved a search for viruses, spyware, Trojans and other security related issues." (Pl.'s Ex. 1, at 3; see also Docket No. 87-5, Ex. Moshlak Report, at 3.) Moshlak used "Computer Associates Pest Control, Norton Antivirus 2006 and PCTools Spyware Doctor," to perform this search, but was unable to find any active viruses.  (Id.)

"In light of the fact there were no obvious issues, [Moshlak] conducted further examinations with . . . ProDiscover from Technology Pathways and Forensic Toolkit from AccessData." (Id. at 4.)  Moshlak used "selected keywords including but not limited to the defendant's name, the defendant's alleged Hotmail account, images, various words, phrases and names." (Id.)

Moshlak found that Lawson's findings lacked "due diligence" and were "defective." (Id. ¶ 3.)  "Specifically speaking, [Moshlak] was able to find the remnants of a program known as *Gator*." (Id.)  Moshlak stated that Gator can be installed on a computer without a user's knowledge: Moshlak reported this is

CIVIL 04-2377 (ADC)                              8

known as "drive-by downloads." (Id. ¶ 4.)  Moshlak stated that Gator appears to

provide functionality by storing passwords, e-mail addresses and credit card

information, and then using an auto-fill function when that information is

necessary.  (Id.)  However, stated Moshlak, Gator may be "hacked" with a

program known as "Office Companion," which tracks web sites visited by users

and sells this information to advertisers, who target users with pop-up

advertisements.  (Id. ¶ 5.)

Moshlak reported that an IT department had removed adware, Trojans,

spyware and Gator from Godreau's computer.  (Id. at 5, ¶ 1.)  However, Moshlak

also reported it was "distinctly possible, if not probable" that Gator's ability to

perform the auto fill-in function, combined with an unsolicited e-mail to the

defendant, was responsible for Godreau's memberships in various web sites.  (Id.)

Moshlak stated that "[a]fter conducting a series of tests with ProDiscover

and Forensic Toolkit, [he] was *unable* to find any JPEG's, MPEG's or other

multimedia that would show women (or men for that matter) in a manner that

could be deemed sexually demeaning and [sic] nature."  (Id. ¶ 2, emphasis

added.)  Moshlak also found additional evidence of malicious software, data

miners and "browser hijack attempts."  (Id. ¶ 3.)

Moshlak concluded that, "[b]ased upon the actions of the plaintiff in this

case, the inactions and the lack of physical evidence, specifically speaking,

CIVIL 04-2377 (ADC)                        9

multimedia, I find it extremely unlikely that these pop-ups did happen." (<u>Id.</u> at

6, ¶ 1.)  Moshlak theorized that "[e]ven if the allegations were true, there is

evidence supporting that *Gator* was installed on the system and the computer was

turned into a 'zombie machine,' where Godreau had no control over its actions

. . . ." (<u>Id.</u>)  Moshlak added that, because Godreau was not the only one using the

computer, some other user could have downloaded the software accidentally.

(<u>Id.</u>)

Moshlak also noted that Godreau "made a constructive effort to keep his

computer clear of viruses and adware using Lavasoft's AdAware product and

Norton Anti-Virus, thus showing supporting physical evidence of a constructive

nature to prevent a problem on the part of Godreau. . . ." (<u>Id.</u>)  Moshlak

concluded that Godreau's information had already been sold to third parties by

Gator and "there is no doubt in [Moshlak's] mind that [Godreau has] been the

recipient of a number of unsolicited commercial e-mails from various sources."

(<u>Id.</u> ¶ 2.)

Moshlak provided screen captures as exhibits attached to his report. (<u>Id.</u>,

App.) These screen captures purportedly show that parts of the Gator program

were found along with data miners, malicious software (also known as "malware")

and adware. (<u>Id.</u>, App., at 4-26.)

CIVIL 04-2377 (ADC)                              10

On March 14, 2006, Godreau issued a sworn affidavit stating he "had used" the e-mail latitude341@hotmail.com.  (Pl.'s Ex. 7; see also Docket No. 72, at 26.) On April 24, 2006, Moshlak received an e-mail from Joanne Pardo, counsel for Godreau, informing him that Godreau informed her that he had not used the e-mail latitude341@hotmail.com for a "long time, probably more than a year." (Pl.'s Ex. 6.)  Attached to the e-mail was Microsoft's response to Rivera's subpoena inquiring into the ownership of latitude341@hotmail.com.  (Id.)

A deposition of Godreau was scheduled because the plaintiff found the term "had used," in Godreau's sworn statement, was unclear and plaintiff sought a more detailed explanation of Godreau's relationship with the e-mail address. (Docket No. 72, at 33.)  Production of a computer Godreau was assigned May 15, 2004, more than six months after Rivera was terminated, was also scheduled, dependant on a relevancy finding by the magistrate judge after the Godreau deposition.  (Id. at 37-52.)

Godreau was deposed on April 26, 2006 (see Docket No. 64, at 4), and on May 1, 2006, Rivera filed a motion to compel production of the second computer used by Godreau.   (Docket No. 68.)   Rivera cited the fact that during his deposition Godreau admitted to using the e-mail latitude341@hotmail.com on his previous laptop (the one already examined by Lawson) as well as continuing to use that e-mail on his current laptop.  (See id.)  On June 9, 2006, this court

CIVIL 04-2377 (ADC)                         11

granted Rivera's motion to compel production of the second computer.  (Docket

No. 78.)

On June 19, 2006, Lawson received the second laptop, made a copy of the

hard drive, and returned the laptop to Rivera to return to Godreau.  (Pl.'s Ex. 5,

at 5; see also Docket No. 100, at 1, ¶ 5.)  Lawson's forensic analysis of the

second laptop's hard drive uncovered the same results as his analysis of the first

hard drive; there was evidence of pornographic images, albeit only twenty to

twenty-five images (Pl.'s Ex. 5, at 5, ¶ 7) and deleted "cookies and/or index.dat"

entries indicating visits to pornographic web sites found in the unallocated file

space of the hard drive.  (Id. ¶ 10.)  Again, because these entries were found in

the unallocated space, Lawson reported it was impossible to ascertain the

circumstances surrounding their access.  (Id. ¶¶ 8, 10.)  Lawson attached screen

captures of these entries and made special note of the fact that "david" was not

only the registered user, but also the name of the account associated with these

entries.  (Id. at 6, ¶ 2.)

Lawson also compared the web sites visited on the first laptop to those

visited on the second and, although he found that significantly fewer web sites

were visited on this second computer, Lawson found several matches.  (Id. ¶ 3;

id., App. at 32-36.)  These duplicate web sites included "riskymail4free.com,"

"ultrahardcoremovies.com,"   "easy-porn.net,"   "webfreeporn.com,"   and

CIVIL 04-2377 (ADC)                    12

"pornchick.com."  (Id. at 6, ¶ 5.)  Lawson noted there may very well be more matches, but the sheer volume of pornographic web sites on the first computer made it impossible to discover all the duplicates. (Id.) Lawson concluded that the fact that there were matching web sites on both computers made it "very unlikely that the entries in the second computer were the result of some sort of Trojan or virus." (Id. at 6, ¶ 4.)

        "The most revealing of these duplicate entries of pornographic web sites on both computers was . . . the web site www.riskymail4free.com."  (Id. ¶ 6.) Lawson noted that not only was this web site present on both computers, but  had also been logged on to by a member on both machines.  (Id. ¶ 7.)  Again, Lawson concluded it was unlikely that a virus or Trojan would cause a login to the web site on both computers.  (Id.)

        Lawson concluded that:

        [B]oth computers examined showed regular, purposeful access to
        pornographic web sites and images and that this use was associated
        with the user David Godreau, his Internet e-mail address
        "latitude341@hotmail.com" and the password "platerobank."

(Id. at 7.)   Again, these results were verified with screen captures of the investigations.  (Id., App.)

        The defendants had their expert, Moshlak, review the second hard drive as well.  (Def.'s Ex. C; see also Docket No. 95-1, Ex. A.)  Moshlak once again made

CIVIL 04-2377 (ADC)                    13

a mirror copy of the laptop's hard drive with "Logicube Echo Plus and a Logicube

Write Protect Disk Blocker."  (Def.'s Ex. C at 3-4.)

After the fourth page, Moshlak's second report reads almost exactly word-

for-word the same as his first report (id. at 4-10; see also Pl.'s Ex. A, at 2-6), with

only three significant differences:  Moshlak blames Godreau's choice of AOL web

mail as one of the ways that software may have been downloaded without

Godreau's knowledge (id. at 7-8); Moshlak concludes that any similar data found

on Godreau's second computer should be considered "moot" because the data

from the first computer had been loaded onto the second computer (id. at 8, ¶ 4)

and; Moshlak notes that unsolicited e-mails usually come with a computer

generated or generic password."[2]  (Id. at 9, ¶ 2.)

In other words, Moshlak once again, after running a series of tests, found

no *active* viruses, malware, or spyware (id. at 4), but reported he discovered

remnants of the program "Gator" on Godreau's computer.  (Id. at 5.)  Moshlak

stated he was again unable to find images of men or women "in a manner that

would be deemed sexually demeaning" (id. at 7), and again concluded that

Godreau's computer had been turned into a "zombie machine" over which

Godreau had no control.  (Id. at 10.)  Moshlak provided screen captures of his

_____

[2] Other differences include two paragraphs on Computerlegalexperts.com's "proprietary approach" of using "hard" and "soft" targets (Def.'s Ex. C, at 5) and an anecdote about an AOL employee "harvesting" e-mails for marketing purposes. (Id. at 6.)

CIVIL 04-2377 (ADC)                                    14

investigation as an appendix to his report: these screen captures purportedly confirm the existence of the malware, adware and data miners.  (Id., App.)

Moshlak was deposed sometime at the end of August 2006.  (Docket No. 124, at 139:9-11.)  On September 11, 2006, after being deposed, Moshlak prepared a "supplemental" to his report on the second hard drive.  (See Docket No. 124, at 124:3-6; Def.'s Ex. D.)  In this supplemental, Moshlak reviewed the "unallocated area" of the second hard drive and reported he found approximately 21 questionable images, "including those that are of a partial and / or duplicative nature. . . ."  (Def.'s Ex. D, at 1, ¶ 2.)  Moshlak reported these images appeared to be unsolicited commercial e-mail sent to Godreau via the internet.  (Id.)  Moshlak attached screen captures of these images to his report.  (Id., App., at 5-14.)

Moshlak also reported that "[b]ased upon the Modified Date's [sic] and Access Date's [sic], respectively, it appears that the hard-drive was tampered with."  (Def.'s Ex. D, at 1, ¶ 5.)  Moshlak concluded that the data on the second hard drive was tampered with while it was in the possession of Judith Berkan, counsel for Rivera.  (Id. at 2.)  However, while screen captures of these files are attached to Moshlak's report (id., App., at 16, 18-25), Moshlak failed to explain how these facts lead him to his conclusion, or even how these screen captures support his cited facts.

CIVIL 04-2377 (ADC)                    15

Moshlak reported there was a "'cookie' / 'index.dat'" file created on the hard drive on April 30, 2004, which had not been accessed since August 17, 2004.  (Id. at 1.)  Although Moshlak did not mention "Riskymail4Free" in connection with this cookie / index.dat file, one can only assume this is the same cookie / index.dat file Moshlak mentions later in his report, where he  concludes that Godreau did not use the service "Riskymail4Free."[3]  (Id. at 2.)  The supposed evidence of this conclusion is attached to Moshlak's supplemental.[4]  (Id., App., at 17.)  Again, Moshlak fails to explain how these observations lead to this conclusion, or even how the screen shots establish any of his observations.

Moshlak also concluded that, because the computer had a wireless modem installed, it was "fair to make an inference that this computer may have been compromised, by person or persons unknown."  (Id. at 2.)  Again, Moshlak provides no support for this conclusion.

On November 9, 2006, Rivera filed a motion to exclude Moshlak from testifying.  (Docket No. 87.)  Rivera argued Moshlak should not be allowed to testify because he has no specialized expertise in computer forensics; what

---

[3] Moshlak's supplemental is simply not clear.  While there appear to be two distinct sections, one for findings and another for conclusions, Moshlak fails to delineate how he reached the latter from the former.

[4] Moshlak states that this "evidence" is on any but the correct page in the Appendix. Moshlak first states this screen shot is available on page 18 of the Appendix, but later states it is available on page 16.  The correct page is page 17.

CIVIL 04-2377 (ADC)                    16

expertise he has is based on fabrications and embellishments; his methodology has no indicia of reliability; his conclusions were based on human nature; Moshlak did not examine the second computer; and apparently Moshlak admitted during his deposition that his central premise, that a virus hijacked Godreau's computer, was an impossibility.  (Id. at 1.)

In my prior recommendation I found that Moshlak had in fact "previously worked with recovery of deleted and decrypted files" (Docket No. 111, at 5); performed data recovery while working for ITT (id.); and performed computer forensics under his own business license known as Buckshot Company.  (Id. at 6.) Specifically, I found that "Moshlak has performed work related to decrypting passwords, finding information in hard drives, creating mirror images, [and] doing a sector by sector backup of unallocated areas of computers."  (Id.)  All of these conclusions were based on Moshlak's curriculum vitae and his August 29, 2006, deposition.  (See Docket No. 95-3, Ex. B.)

Second, I found in that report that Moshlak used the proper software tools necessary to conduct the forensics analysis.  (Docket No. 111, at 7-8.)  I made special note of the fact that the same products used by Moshlak are those used by the United States General Services Administration.  (Id. at 8.)  I also noted that the observations made by Moshlak involving "human nature" were under the heading "other observations" and was made as a "personal note."  (Id. at 7.)

CIVIL 04-2377 (ADC)                           17

Such observations do not fall outside the scope of opinions allowable to expert witnesses.  (Id.)

Third, I found in that report that Moshlak explained that the information from the first computer had been copied to the second computer, which would bring doubt to any test he performed.  (Id. at 8-9.)  Moshlak also stated that he had in fact checked the second hard drive for malicious software, spyware and viruses.  (Id. at 9.)

I concluded that "[t]his court should not exclude debatable evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility."  (Id. at 9 (citations and quotations omitted).)  "Whether there was pornography in the computers is an issue of fact that must be determined ultimately by the trier of fact and not in this motion in limine."  (Id. at 11.)

On June 1, 2007, Rivera filed a motion to clarify the setting of the Daubert hearing, where she argued that, even though her motion for exclusion had been denied, the court was still required to hold a Daubert hearing.  (Docket No. 112, at 4.)  Rivera argued that the "key question which this court must resolve . . . is whether there is any scientific or other evidence of reliability for [Moshlak's] methodology and the link between that methodology and the conclusions reached."  (Id. at 2-3, emphasis added.)

CIVIL 04-2377 (ADC)                    18

In keeping with the Daubert "gate-keeping" function, an evidentiary hearing was held on October 9 and 10, 2007, to determine if plaintiff's motion to exclude Moshlak had merit or if such exclusion should remain denied.  (Docket Nos. 120 & 121.)

In his direct examination at the Daubert hearing, Moshlak reviewed the steps he took to conduct his investigation.  (Docket No. 124, at 74-110.)  His testimony confirmed the procedures he used to analyze the hard drives from Godreau's computers; he removed the hard drives from the computers (id. at 76); he made mirror images of the hard drives with a program named "Logic Cube" (id. at 79, 80); and used several different programs, including the program "Forensic Tool Kit," to analyze the data on the hard drives and ensure the integrity of that data. (Id. at 85-110.)   This data included images, e-mails, URL's and IP addresses.  (Id. at 99.)   Moshlak also searched through databases and "bad extensions" – areas where an individual could hide files.  (Id. at 101.)  Moshlak looked to see what "cookies," programs that track a person's internet use, were present in the hard drives.  (Id. at 106.)   Moshlak checked for spyware and viruses on the hard drives.  (Id. at 108.)

Moshlak testified that after he performed these searches on the first hard drive, the term "Gator" came up.  (Id. at 111.)  Moshlak explained that Gator is a program that can be used to exploit a computer.  (Id.)  Moshlak testified he

CIVIL 04-2377 (ADC)                    19

validated this information by doing a "live search" for the terms "Gator" and "Gain Network," the organization which produced Gator.  (Id. at 112.)  While Moshlak failed to make clear what a "live search" entailed, he testified that this confirmed Gator was on the hard drive.  (Id. at 114.)

Moshlak testified he "noticed there was an e-mail address that happened to have been used."  (Id.)  Moshlak testified that this e-mail address, along with the "alleged password" in Lawson's report produced "some hits, but the hits that came up were from incoming e-mails."  (Id.)  Moshlak testified that, in his opinion, "the user of the first computer ended up receiving information that was unsolicited commercial e-mail[,]" because, "[b]ased upon the e-mail [Moshlak] received and based upon the fact that [Godreau] was using Hotmail, it was not unusual for people to receive this type of e-mail."  (Id. at 115.)  Moshlak did not clarify what he meant by "the e-mail [he] received. . . ."  Moshlak concluded by reporting he was unable to find pornography and that Godreau had e-mails that appeared to be unsolicited. (Id.)

Moshlak testified that upon analyzing the second hard drive, he noticed that certain files, system and security files, which Moshlak testified are critical, had a date stamp of June 20, 2006.  (Id. at 122-126.)  Moshlak interpreted this to mean that someone altered the hard drive on that particular date and time.  (Id. at 124.) However, Moshlak could not testify what were the specific alterations.  (Id.)

CIVIL 04-2377 (ADC)                    20

Moshlak testified that the other date stamps were June 11 and 14, 2006. (Id. at

126.)  Moshlak testified that, because data on the hard drive had been altered on

June 20, 2006, he excluded files with a date beyond June 14, 2006 from his

search of the second hard drive.  (Id. at 127.)  Moshlak testified that these facts

were left out of his first report because these modifications occurred once he had

returned the computer to the offices of Judith Berkan, Rivera's attorney. (Id. at

128.)

        Moshlak testified he found remnants of Gator on the second hard drive. (Id.

at 130.)  Moshlak testified that upon making this discovery, he contacted "the

attorneys or possibly the law offices," and was informed that files from the first

hard drive had been copied onto the second hard drive.  (Id.)  At that point,

testified Moshlak, he stopped his search on the computer because he believed the

remnants of Gator had simply been copied onto the second hard drive.  (Id. at

131-132.)  Moshlak testified he found no pornography on the second hard drive.

(Id. at 132.)

        On cross-examination, Moshlak confirmed that the first time he searched the

unallocated space in the second hard drive was after his deposition in late August

2006, a fact he included in his "supplemental." (Id. at 140.)  However, Moshlak

seemed confused as to whether he searched the unallocated areas of the first

hard drive.   Counsel for Rivera first inquired if Moshlak had searched for

CIVIL 04-2377 (ADC)                          21

pornography in the unallocated areas of the first hard drive.  (Id. at 141.)

Moshlak responded that he looked for any and all images that were brought up by

the tool kit.  (Id.)  Attorney Berkan referred Moshlak to his deposition where he

had testified that he looked "exclusively" at the active areas of the first hard drive.

(Id. at 141-142.)  Moshlak's testimony in his deposition was that he did this

because he "was able to determine that spyware had already infected the machine

and the machine was compromised."  (Id. at 143.)   Then, in a somewhat

confusing reversal, Moshlak testified that he did, in fact, search the unallocated

area of the first hard drive.  (Id. at 143.)

Moshlak testified he had seen the screen shots in Lawson's report and was

unable to find such images.  (Id. at 144.)  Moshlak also testified that, at the time

of these searches, he had received no formalized training in Forensic Tool Kit, the

program he used to reach his conclusions, but had in fact only attended informal

briefings.  (Id. at 145-147.)  Moshlak also testified that he had previously used

Logic Cube, the hardware used to create a "mirror image" of the hard drives in

question, only one time prior to using it in his investigation in this case.  (Id. at

153.)

Moshlak confirmed that he first searched the unallocated spaces in the

second hard drive only after his deposition in late August 2006 and that was the

first time he found pornography.  (Id. at 166.)  Moshlak testified that all the date

CIVIL 04-2377 (ADC)                         22

stamps on the images he found were the same, June 20, 2006, 2:36:16 p.m., and

that, on that date, the hard drive was at the offices of attorney Berkan.  (Id. at

166-168.)  She asked if such a stamp could be created by booting the computer;

Moshlak answered in the affirmative, but testified that National Institute of Justice

standards do not allow computers to be turned on once they are in evidence.  (Id.

at 168-169.)

     Moshlak testified that Gator cannot subscribe individuals to memberships in

pornographic web sites (id. at 184), but that the pornography he found was

"influenced" by Gator.  (Id. at 192.)  Despite attorney Berkan's attempts to clarify

how Gator could "influence" pornography, Moshlak's statements remained unclear.

(Id. at 193-194.)

     Moshlak testified that he went through the different subdirectories,

presumably to search for pornography.  (Id. at 195.)  Attorney Berkan asked

Moshlak if he searched the specific subdirectory "my music."  (Id.)  However,

Moshlak could not explain which subdirectories he searched because he neither

made a list nor printed a report of those subdirectories he searched.  (Id.)

Moshlak could also not recall the words he used in his "lives searches" because,

again, he neither made a list nor printed a report of such search terms.  (Id. at

196.)

CIVIL 04-2377 (ADC)                    23

Moshlak testified that he did not know that the e-mail latitude341@hotmail.com was associated with Godreau. (Id. at 206.) However, Moshlak also testified that he had seen the sworn statement and deposition testimony where Godreau testified that the e-mail address in question belonged to him. (Id. at 207.) Moshlak also testified that, while he was aware that plaintiffs had to get a court order to get this same information from Microsoft, he was not aware of what was contained within the court order. (Id.)

Moshlak expressed doubts that Godreau had a membership in pornographic web sites simply because Godreau's e-mail and password were associated with the log in page to "teenxxxmag.com"; Moshlak once again attributed this to Gator and unsolicited commercials e-mails. (Id. at 209-210.) Similarly, Moshlak expressed doubts that Godreau had a membership to another website, because the password there was "plateroban" and not "platerobank," a password which, in previous screen captures, had been associated with latitude341@hotmail.com. (Id. at 210.) Moshlak testified he was not aware that Godreau had testified he used variations of the password "platerobank" for his passwords. (Id. at 210-211.)

Then towards the end of that day's portion of the hearing, attorney Berkan asked Moshlak if it was possible to search the "my music" subdirectory on his mirror image of the hard drive. (Id. at 213.) Moshlak answered that they could do it in the morning because it would take a long time to set up and court would

CIVIL 04-2377 (ADC)                    24

have to run past five in the afternoon.  (Id. at 213-214.)  Moshlak also added that the "carpeting static" could possibly damage the electronics and the hard drive. (Id. at 214-215.)  In fact, Moshlak did not recommend doing it in the court room at all.  (Id. at 215.)  After being pressed by attorney Berkan, Moshlak agreed to conduct a search of the second hard drive.  (Id.)  There was a recess for twenty minutes while Moshlak set up his computer and prepared himself to conduct a search.  (Id. at 216-217.)

Before initiating the search, attorney Berkan once again confirmed with Moshlak that he was only able to find twenty-one (21) images on the second hard drive, and that several of them were duplicates.  (Id. at 217.)  Also before initiating this search, both attorney Berkan and attorney Munera-Pascual, counsel for Godreau, confirmed that they wanted to search the hard drive of the second computer.  (Id. at 218:15-19.)  Moshlak's first search of the "my music" folder presented no results whatsoever.  (Id. at 220.)  This was because Moshlak was looking at his computer's "C" drive and not the "F" drive, which contained the mirror image of Godreau's second computer's hard drive.  (Id. at 222.)  Moshlak attributed this confusion to the fact that he was following attorney Berkan's instructions.  (Id. at 223.)

Once the confusion subsided, Moshlak searched the proper "my music" subdirectory and encountered thirty-six different AVI files with names such as

CIVIL 04-2377 (ADC)                    25

"Holly1," "Katlyn1," "Stacy1" and "Monica1."  (<u>Id.</u> at 223.)   None of the thumbnails of these files appeared to be pornographic images.   Moshlak, unprompted, explained that, because all these files had the same date stamp, there was no way they could all be accessed at the exact same time.  (<u>Id.</u> at 224.) Moshlak testified that "if he was taking a look at this as an expert," his initial reaction would be that someone loaded the files onto the hard drive with a zip file, or used a peer-to-peer network.  (<u>Id.</u> at 225.)  However, Moshlak testified he could in no way theorize who had control of the computer on March 29, 2003, the date the files were created.  (<u>Id.</u>)

Nevertheless, when the time finally came to open the file entitled "Diamond1," Moshlak stated: "I just had a firewall come up on me.  That tells me [I have] got a problem.  Right off the top this is sending [a] message or would send a message out to somebody without my consent.  There you go, there is your Diamond1."  (<u>Id.</u> at 226.)

Attorney Berkan then suggested it be played on Lawson's computer.  (<u>Id.</u>) Moshlak responded:  "I am using a Windows operating system.  This basically means that if it plays on Mr...  What sort of operating...  I don't even know how is he playing it, what is he playing it with, how is it happening.  What I could tell

CIVIL 04-2377 (ADC)                    26

you is this, is based upon what we just observed, I couldn't see it and it validates what I said.  I didn't see it."[5]  (Id. at 227-228.)

The next morning, on October 10, 2007, the Daubert hearing continued. (Docket No. 125.)  Moshlak confirmed he had used Windows software to run the AVI files and did not use the forensic software to run the files simply because he had not been directed to do so by attorney Berkan.  (Id. at 6.)  Moshlak testified he did not know if he could expect his firewall to block the AVI files if he attempted to open them through his forensic software because he had upgraded his firewall recently, leading to changes in his operating system.  (Id. at 7.)

Moshlak testified more specifically about how he searched for pornographic images on a hard drive.  (Id. at 9-11.)  After searching the entire hard drive with Forensic Tool Kit for multimedia files, including AVI files, MPEG files, and sound files, a series of thumbnails – pictures of what may be inside the file – appear on the screen.  (Id. at 10.)  Moshlak then examined those thumbnails for content by opening them in a program named "Apple Quicktime," which opens multimedia files.  (Id.)  Moshlak reiterated that the files could not be opened the previous day because "there's nothing there," and that a firewall alert appeared because "there may have been some sort of attempt to . . . send a code out from my computer to some unknown domain. . . ."  (Id. at 11.)  Moshlak once again testified that

---

[5] The ellipses in this sentence are the original in the transcript and are not being used to denote missing words or phrases.

CIVIL 04-2377 (ADC)                           27

when he originally searched the hard drive to the second computer, the AVI files found in "my music" during the hearing were not there.  (Id. at 15.)  "And you saw it today..."[6] testified Moshlak, "you saw it yesterday, it wasn't there. Therefore I can't... You know, I can only report what my findings are."  (Id.)

Moshlak testified that of all the files he opened on the first computer, he was unable to find any that were related to pornography.  (Id. at 16.)  Moshlak looked through the thumbnails and opened some of them, but he did not look at every single file; Moshlak only looked at the thumbnails, not the actual files, to determine whether the file was pornography.  (Id. at 17.)

Moshlak testified that, even though he had no direct evidence that (1) Godreau's information had been sold by Gator to various entities; (2) Godreau had been the recipient of unsolicited commercial e-mails; or (3) that Godreau's information was on the Gain Network, Moshlak felt comfortable concluding that Godreau's information had, in fact, been sold through Gator.  (Id. at 26-28.)

Moshlak testified that his conclusion that Godreau's computer had been "hijacked" – that someone other than Godreau had gained control of his computer through technological means – was based on his interview with Joanne Pardo[7] (hereinafter "Pardo"), counsel for Godreau.  (Id. at 32.)  Moshlak testified he

---

[6]Again, these ellipses are part of the original transcript and do not signal missing words or phrases.

[7] Referred to incorrectly as "Pargo" throughout most of the transcript.

CIVIL 04-2377 (ADC)                    28

received an e-mail from Pardo on April 24, 2006, wherein Pardo informed Moshlak that it was Godreau's position that he had not used the e-mail latitude341@hotmail.com in "probably more than a year." (Id. at 33.)  However, Moshlak testified he did not recall ever seeing Godreau's sworn statement concerning Godreau's use of the e-mail.  (Id. at 33-34.)  Moshlak did testify that he had seen the subpoena to Microsoft where it was certified that the e-mail latitude341@hotmail.com was connected to a "David Godro" who had registered the same birth date, but different birth year, as Godreau.  (Id. at 34.)  Moshlak testified he was aware of Godreau's deposition testimony on April 26, 2006, wherein he testified that he still used the e-mail latitude341@hotmail.com.  (Id. at 36.)

Moshlak, "referring to what Chris Brown put in his book about dealing with computer forensics," testified that computer forensics is "an art and a science." (Id. at 38.)  Moshlak confirmed that "the knowledge of how to use the tools is very important," but "the art is how to interpret the data. . . ." (Id.)  Moshlak testified that, although he had no law enforcement experience at the time of his reports, Moshlak comes from a "different community, [which] requires analysis that is . . . a little more intense than what law enforcement does perform." (Id. at 39.)

CIVIL 04-2377 (ADC)                    29

Moshlak testified that he hoped that a "representation . . . made by counsel would be far more credible than that I would receive under sworn testimony." (Id.) Moshlak testified he believed that Pardo's representations "far outweighed" any evidence that was available to Moshlak at the time.  (Id. at 40.)  Moshlak testified he made conclusions based upon "Pardo's representations . . . concerning [the] transfer of information from the first machine to the second machine. . . ." (Id.)

Moshlak testified that after he followed the directions given in the Forensic Tool Kit manual and directions provided by support services, he was unable to find any evidence in the form of multimedia files to support the plaintiff's claim.  (Id. at 43.)  Moshlak testified that files with women's names did come up during the search he reported in his August 3, 2007, report.  (Id. at 44.)  Moshlak testified that seeing a name like "Candy, Monica, [or] Fauna," would not inspire him to open the file and examine it further.  (Id. at 46-47.)  "I don't necessarily go into particular names, because I never... Again, I'm looking at the pictures to determine whether or not there happens to be anything that would lead me into going...[8]  Whether there's reason to look for it."  (Id. at 47.)

Moshlak testified that he was able to find pornographic images after his deposition to include in his supplemental report because he engaged in a

_____

[8] Ellipses in original transcript.

CIVIL 04-2377 (ADC)                          30

procedure known as "data carving." (Id. at 48.)  Moshlak suggested that data

carving is a "very dangerous tool" because when "you engage in data carving, and

you let the computer try and piece things together, it can come back with what

we call inconclusive evidence.  It may be support of direct evidence, but it's

inconclusive." (Id. at 48-49.)  Moshlak explained that those files had been there

all along, but he was using a different process to find the files because "the files

were broken up, they were not contiguous." (Id.)

Moshlak also testified that it is "probable" that movie files, such as AVI files,

produce a thumbnail, and that to ascertain the files' contents, the file must be

opened. (Id. at 52.)

Moshlak testified he did not use the "data carving" technique on the first

computer because he did not believe it was necessary at the time. (Id. at 54.)

Moshlak did concede that, had he gone back and used data carving on the first

computer, he would have found pornographic images on there as well. (Id.)

Moshlak testified that if a video file, such as AVI or MPEG were not able to

open in Forensic Tool Kit, then he could use Quicktime, Windows Media Player, or

a number of other programs to open and view movies. (Id. at 121.)  Moshlak

testified that because a movie file does not play on Quicktime does not mean the

file is not on the hard drive. (Id.)

CIVIL 04-2377 (ADC)                    31

Moshlak testified that after he was unable to find any pornographic files using Forensic Tool Kit and Technology Pathways Pro Discover, another forensic computer tool, Moshlak did not, as attorney Berkan suggested, open up "my documents" on the computer and start looking for pornographic files.  (Id. at 122.)  Moshlak attributed his terse methods to the limited scope of time he had to perform the work he was asked.  (Id. at 123.)  Moshlak confirmed that he had the first computer from at least February 3, 2006, to June 26, 2006.  (Id.)

## II.  THE DAUBERT STANDARD

Federal Rule of Evidence 702 provides that if an expert witness' testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," then he or she may testify, provided the "witness [is] qualified as an expert by knowledge, skill, experience, training, or education," or "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  The admissibility of  the expert's testimony is governed by Federal Rule of Evidence 104(a) and as such is to be proven by its proponent by a preponderance of the evidence.  See Fed. R. Evid. 702 advisory committee note (citing Bourjaily v. United States, 483 U.S. 171 (1987)).

CIVIL 04-2377 (ADC)                    32

Courts enjoy wide latitude in assessing whether an expert's testimony will materially assist the jury.  United States v. Vargas, 471 F.3d 255, 261 (1st Cir. 2006) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 594-97 (1993)).   However, "Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998).  While "conclusions and methodology are not entirely distinct from one another, . . . nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." Id. at 81 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).   The main focus in a Daubert analysis must be "on principles and methodology, not on the conclusions that they generate." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595.

If an "opposing party . . . raises a material dispute as to the admissibility of scientific evidence," then a 104(a) evidentiary hearing is required in order to establish the relevance and reliability of the methodology employed by the expert witness.  Bado-Santana v. Ford Motor Co., 364 F. Supp. 2d 79, 104 (D.P.R. 2005) (quoting Daubert v. Merrell Dow Pharms Inc., 43 F.3d 1311, 1319 n.10 (9th Cir. 1995)).  "Daubert does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the

CIVIL 04-2377 (ADC)                    33

situation is correct[,]" <u>United States v. Vargas</u>, 471 F.3d at 265, "Daubert demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." <u>Id.</u> (quotations and parentheses omitted).

## III.  DISCUSSION

Rivera's arguments in her November 9, 2006, motion to exclude Moshlak as an expert witness all went to Moshlak's credentials and methodology and not to the application of that methodology to the facts of this case.  Because Moshlak's curriculum vitae was supported by documentation and Moshlak used the same computer forensics programs used by the United States General Services Administration in similar investigations, I denied Rivera's motion in my May 30, 2007, report and recommendation.

However, after witnessing Moshlak's often vague, mostly befuddling, and sometimes contradictory testimony at the hearing, I can only conclude that Moshlak's testimony would not serve to "materially assist the jury."  Although Moshlak's methods may be reliable – because they are the same used by the United States – it does not appear that he has applied those methodologies reliably to the facts of this case.  Therefore, Moshlak should be excluded from testifying as an expert witness at trial.

CIVIL 04-2377 (ADC)                    34

The first and most telling piece of evidence to support Moshlak's exclusion are his actions at the end of the first day of the <u>Daubert</u> hearing, where the court could not view an AVI movie file named "Diamond1" because Moshlak had a firewall "come up on [him]."  Moshlak testified that if these files played on Lawson's computer, then, apparently, Moshlak had no idea how Lawson would be able to do that.  Moshlak testified:  "What I could tell you is this, is based upon what we just observed, I couldn't see it and it validates what I said.  I didn't see it."  The next morning Moshlak testified he did not know whether his firewall blocked AVI files when he originally searched the second hard drive because he had recently upgraded his firewall.  Moshlak reiterated that the files could not be opened because "there was nothing there."

According to Moshlak's reasoning then, if he finds a file he suspects may be pornographic, but cannot open it because his firewall does not allow it, then the file is not pornographic.  Not only can this in no way help the jury ascertain the truth, but it plainly shows that Moshlak cannot apply the methodology correctly to the circumstances of this case.

Related to this display, but not necessarily to Moshlak's methodologies regarding his search of the computer hard drives, is what can only be described as foot-dragging by Moshlak when attorney Berkan requested the in-court search of the mirror image of the second hard drive.  First Moshlak claimed the search

CIVIL 04-2377 (ADC)                    35

could not be done that same day because there was not enough time remaining for him to set up and perform the search.  This was supplemented by Moshlak's claim that the "carpeting static" in the courtroom could damage the electronics. Next, after agreeing to perform the search and after both Godreau's and Rivera's attorneys made it explicit they wanted Moshlak to search the mirror image of the second hard drive, Moshlak proceeded to search the "C" drive on his computer, and not the "F" drive, which contained the mirror image of the second hard drive. After claiming he was only following attorney Berkan's instructions, Moshlak finally searched the "my music" file on the second hard drive – as attorney Berkan instructed – and found the aforementioned file named "Diamond1," along with thirty-five other movie files with women's names.

The second piece of evidence supporting Moshlak's exclusion is his reliance on attorney Pardo's assertions that her client, Godreau, informed her he had not used the e-mail latitude341@hotmail.com in the face of explicit evidence to the contrary.  Moshlak specifically stated he relied on Pardo's assertions when conducting his investigations, even though he was aware that Godreau had testified otherwise.  Even at the hearing, Moshlak testified he did not know for a fact that Godreau was the owner of latitude341@hotmail.com.

This is nothing if not willful blindness.  Godreau was deposed and admitted to using the e-mail address latitude341@hotmail.com on April 26, 2006, before

CIVIL 04-2377 (ADC)                    36

Moshlak's second report.  Yet, as late as the date of the Daubert hearing, Moshlak

testified that his conclusion that Godreau's computer had been "hijacked" was

based on Pardo's representations.  Although Moshlak's willful blindness to this

aspect of his investigations cannot lead to any direct conclusions as to his

application of methodologies to facts, such blindness in this respect does nothing

but bolster any doubts as to his due diligence in other aspects of his investigation.

        Third in support of Moshlak's exclusion is his statement that seeing files with

names like "Candy, Monica [or] Fauna" would not inspire him to further

investigate those files to determine whether they were pornographic images.

Moshlak testified he did not open those files because he was looking at the

thumbnails to determine whether the files were pornographic, but, thumbnails can

be misleading; the thumbnails I saw during Moshlak's in-court search of the "my

music" subdirectory certainly did not show pornographic images.  Also, seeing as

Moshlak concluded there was no pornography in the "my music" folder because

he "didn't see it," such assertions begin to ring hollow. Obviously, a woman's

name alone does not indicate that a file is pornographic; nevertheless, when the

purpose of a search is to determine whether pornographic files exist on a hard

drive, it would not be imprudent to look at files that have women's names.  Again,

while Moshlak possesses the proper credentials and methodologies to conduct

CIVIL 04-2377 (ADC)                    37

such searches, he simply does not apply those to the facts of this case with any reliability.

Related to this point is Moshlak's contradictory statement during the Daubert hearing regarding his search of subdirectories.  First, Moshlak testified that he went through the different subdirectories, presumably in search of pornography.   At that time, attorney Berkan inquired if he searched the subdirectory "my music," to which Moshlak responded he could neither remember the specific subdirectories he searched nor made a report of the same.  Later, Moshlak, prompted by attorney Berkan's questions about his methodologies, testified that, after he ran the programs Forensic Toolkit and Technology Pathways ProDiscover, he did not open and search through subdirectories like "my documents" because he had a limited amount of time to conduct his search.

Moshlak testified he would not be inspired to open any files with names like "Candy" or "Fauna."  This may be because he found no such files, since he never searched individual subdirectories.

The fourth piece of evidence supporting Moshlak's exclusion also deals with contradictory statements made during the Daubert hearing regarding Moshlak's search of the unallocated areas of the first hard drive.  When asked by attorney Berkan whether he had searched the unallocated areas of the first hard drive for pornographic images, Moshlak responded that he had searched for "any and all"

CIVIL 04-2377 (ADC)                    38

images that were brought up by the Forensic Toolkit.  Attorney Berkan then referred Moshlak to his deposition testimony where he stated he had looked "exclusively" at the active areas[9] of the first hard drive.  Moshlak's deposition testimony was that he did this because he determined that the computer had already been "compromised."  Then, Moshlak reversed his position, and testified that he *did* search the unallocated area of the first hard drive.

This type of impeachment does not simply show that Moshlak may be prone to changing to a more convenient position depending on the circumstances, but goes to a central aspect of the investigation.  By all indications, Moshlak was resolute in the fact that he did not search the unallocated space of first hard drive until he perhaps realized it would make his investigation seem incomplete.  If Moshlak's investigation were to make any sense, he should have searched the unallocated space of the hard drives first,  because that is where Lawson found pornography.  In other words, Moshlak should have been sure he *did* check the unallocated spaces if he were to counter Lawson's findings; any doubt otherwise leads me to believe Moshlak's search was incomplete.

Finally, one last piece of Moshlak's testimony supports his exclusion as an expert witness.  Moshlak testified he had no direct evidence that Godreau's

---

[9] As a reminder, "active" and "unallocated" areas are the two different parts of a hard drive that may be searched; active is where visible files are stored, and unallocated is where files that have been previously deleted are stored until overwritten by new data.

information had been sold by Gator to various third parties, yet Moshlak testified he was completely comfortable making such a conclusion.  This is exactly the kind of testimony Rule 702 seeks to exclude:  "an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation."  Bado-Santana v. Ford Motor Co., 364 F. Supp. 2d at 101 (quoting Damon v. Sun Co., 87 F.3d 1467, 1474 (1st Cir. 1996)).

Moshlak's testimony at the Daubert hearing successfully casts a pall over his reports.  Moshlak's central theme in his first two reports was that, not only was there no pornography on the computers, but if there was, it was attributable to Gator, and not to Godreau.  But Moshlak backed into this theory:  in his first two reports, Moshlak stated he first searched for viruses, Trojans, spyware and adware.  Then, only after there were "no obvious issues," Moshlak searched for images, and then only as an afterthought to his search for files with certain keywords such as Godreau's name, various words, phrases and names.  Moshlak did not even provide a list of the keywords he used in his search or any indication of what the success rate of those words are in finding pornography.

In his "supplemental," Moshlak searched the unallocated area of the second hard drive and found the pornography which Lawson had shown in his second report.  Moshlak explained that, contrary to Lawson's report,  Godreau did not log on to "riskymail4free" and the images found related to that web site were from

CIVIL 04-2377 (ADC)                    40

an unsolicited e-mail.  That being all well and good, Moshlak failed to explain how the screen captures he provided lead him to that conclusion, a central element of his admissibility as an expert witness.

## IV.  CONCLUSION

In view of the above I find that the defendants have not met their burden of showing by a preponderance of the evidence that Moshlak's methodologies are reliable under Federal Rule of Evidence 702, or would otherwise assist the jury to understand the evidence or to determine a fact in issue.  Therefore, it is my recommendation that plaintiff's motion to exclude Moshlak as an expert witness at trial be GRANTED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  Failure to comply with this rule precludes further appellate review.  See Thomas v. Arn, 474 U.S. 140 (1985); Paterson-Leitch v. Massachusetts Elec., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13 (1st

CIVIL 04-2377 (ADC)                    41

Cir. 1983); <u>United States v. Vega</u>, 678 F.2d 376 (1st Cir. 1982); <u>Park Motor Mart,</u>

<u>Inc. v. Ford Motor Co.</u>, 616 F.2d 603 (1st Cir. 1980).

      At San Juan, Puerto Rico, this 11th day of February, 2007.


                                          S/ JUSTO ARENAS
                        Chief United States Magistrate Judge